AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>OONE BLACK LG TRACFONE WIRELESS CELLULAR<br>TELEPHONE, IDENTIFICATION NUMBERS:<br>GPLGL322DCG8 and ZNFL322DL | )<br>)<br>)<br>)<br>)<br>)    Case No.   2:21-mj-686 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (Section I) to the Affidavit in Support of the Application, incorporated herein by reference.

located in the     __Southern__     District of     __Ohio__     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment A (Section II) to the Affidavit in Support of the Application, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841(a)(1) | Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substance |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Ypsilantis, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   October 21, 2021              _____
                                       Kimberly A. Jolson

City and state:   Columbus, Ohio         United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF APPLICATION OF THE UNITED STATES OF AMERICA FOR A WARRANT DIRECTING THE SEARCH OF: | Case No.:  2:21-mj-686 |
| ONE BLACK LG TRACFONE WIRELESS CELLULAR TELEPHONE, IDENTIFICATION NUMBERS: GPLGL322DCG8 and ZNFL322DL | **UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, John Ypsilantis, being duly sworn, depose and say:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and, acting as such, I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the United States Attorney General to request a search warrant.

2.      I entered on duty at the FBI Academy in Quantico, Virginia, on May 14, 2017.  I am currently assigned to the the to the FBI Cincinnati Division (Columbus Resident Agency) Joint Terrorism Task Force (JTTF).  I have been assigned to this squad since January 2021.  From October 2017 until January 2021, I was assigned to the FBI Pittsburgh Division Greater Pittsburgh Safe Streets Task Force.  I was employed as a U.S. Border Patrol Agent with the Department of Homeland Security (DHS) Customs and Border Protection (CBP) from July 23, 2009 to May 13, 2017.  From January 2012 until May 2017, I was assigned as a Task Force Officer (TFO) to the FBI Cleveland Division Organized Crime Task Force.

1

3.    During the course of my employment as an FBI Special Agent, FBI TFO, and U.S. Border Patrol Agent, I have participated in numerous complex criminal, national security, and international and domestic terrorism investigations, as well as investigations of criminal organizations involved in both the manufacture and distribution of controlled substances. I have also participated in numerous investigations involving the use of federal and state search warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, and other types of evidence that document the activities of criminal organizations in both the manufacture and distribution of controlled substances. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including physical and electronic surveillance, various types of infiltration (including undercover agents, informants, and cooperating sources), pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, mail covers, pole cameras, stationary video recordings, and audio and audio/video recording devices. Additionally, I have personally participated in Title III wiretap investigations, pursuant to 18 U.S.C. § 2516, in the Northern District of Ohio (NDO) and the Western District of Pennsylvania (WDPA).

4.    For instance, I was the lead agent in a federal investigation into a violent, neighborhood street gang known as "SCO". As a result of that investigation, from January 2019 through May 2019, I obtained nine Title III wiretap authorizations. As a result of that wiretap investigation, thirty-three individuals were charged by a federal grand jury in three related Indictments for violations of federal drug and firearms laws. *See U.S. v. Leavy, et al.*, Crim. No. 19-160 (WDPA June 4, 2019); *U.S. v. McFadden, et al.*, Crim. No. 19-162 (WDPA June 4, 2019); *U.S. v. Vanderslice, et al.*, Crim. No. 19-163 (WDPA June 4, 2019).

2

5.       Additionally, I was the lead agent in a federal investigation into the violent, outlaw motorcycle gang known as the Pagan's Motorcycle Club. As a result of that investigation, from August 2020 through December 2020, I obtained ten Title III wiretap authorizations. As a result of that wiretap investigation, thirty individuals were charged by a federal grand jury in three related Indictments for violations of federal drug and firearms laws. *See U.S. v. Kushik, et al.*, Crim. No. 20-374 (WDPA Dec. 1, 2020); *U.S. v. Peluso, et al.*, Crim. No. 20-375 (WDPA Dec. 1, 2020); *U.S. v. Rana, et al.*, Crim. No. 20-377 (WDPA Dec. 1, 2020).

6.       In addition to the training I received at the FBI Academy and the U.S. Border Patrol Academy, I have received specialized training from the FBI and DHS/CBP focused on topics such as drug interdiction, drug detection, money laundering techniques and schemes, drug identification, asset identification and removal, and methods utilized by organized criminal enterprises and drug trafficking organizations to carry out the aforementioned criminal conduct.

7.       Through the investigations that I have participated in, my training and experience, and conversations with other agents and law enforcement personnel, I have become familiar with the methods used by organized criminal enterprises, drug trafficking organizations, outlaw motorcycle gangs, street gangs, and prison gangs to smuggle and safeguard controlled substances and firearms, to distribute, manufacture, and transport controlled substances and/or firearms, and to collect and launder related proceeds. I know that, in accordance with 21 U.S.C. § 841, it is unlawful for an individual to manufacture, distribute, or possess with intent to distribute or dispense a controlled substance and, pursuant to 21 U.S.C. § 846, it is unlawful for an individual to conspire to manufacture, distribute, or possess with intent to distribute or dispense a controlled substance.

3

8.      Based on my training and experience, I know that it is common practice for drug traffickers to routinely utilize telephones (including cellular phones and prepaid phones), calling cards, text messaging, email, counter surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other co-conspirators for the purpose of insulating themselves from law enforcement detection. In an effort to hide their true identity, it is not uncommon for drug traffickers to initiate such mobile or prepaid telephone service in the name of an associate or family member or in the name of a fictitious individual. Drug traffickers often require the use of a telephone facility to negotiate times, places, schemes, cost, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the laundering and concealment of proceeds derived from the sale of controlled substances. Moreover, it is not uncommon for drug traffickers to utilize multiple telephone numbers – for instance, a buyer telephone and an associate telephone – as an additional means to avoid law enforcement detection and as an additional layer of protection for the organization should law enforcement seize one phone and not the other. Additionally, as a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug trafficking conspiracies.

9.      Further, I am aware that drug traffickers sometimes use their cellular telephones to take and retain photographs and videos of their drugs and narcotics sales proceeds. Such drug traffickers, like law-abiding citizens, sometimes take photographs and videos using their cellular telephones of themselves with their friends, relatives, and associates and keep the photographs on their cellular telephones. Such photographs and videos, when taken or retained by drug traffickers, can be evidence, and can lead to additional evidence of illegal drug trafficking activity by identifying the drug traffickers, contraband, and people who are actively assisting and/or

4

supporting the drug trafficking activity, as well as the locations where they live or where they store their drugs, proceeds, and/or paraphernalia.

10.     I am aware that evidence of drug crimes can often be found in electronic media, including cellular telephones, laptop computers, cameras, and tablet devices. Such evidence can be found throughout those items, such as in text messages, contact lists indicating the names and numbers of associates, call/text logs indicating calls/texts made to and received from associates, online search history files, word processing documents, photographs, and video files. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling, text messaging, and photographing, can now be performed from many cell phones. In addition, as noted above, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Moreover, the specific phone numbers of, and the specific phone numbers dialed by, particular cellular telephones can be evidence of drug trafficking, particularly in light of the fact that it is a practical necessity that drug traffickers communicate with each other, as well as with their customers and suppliers, by telephone. Such phone numbers can confirm identities of particular associates and the occurrence of certain events.

11.     Further, as with most electronic/digital technology items, communications made from an electronic device, such as a cellular telephone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving a text message or a contact or an e-mail. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a cellular telephone. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a cell phone, was used. Electronic files or remnants

of such files can be recovered months or even years after they have been downloaded, stored, deleted, or viewed.

12.     Additionally, based on my training and experience, I know that cellular technology and mobile computing devices are highly portable, and may be easily stored or concealed on the person of the user/owner.

13.     As explained below, there is probable cause to conclude that evidence of violations of 21 U.S.C. § 841(a)(1), distribution and possession with intent to distribute controlled substances, and 21 U.S.C. § 846, conspiracy to distribute and possess with the intent to distribute controlled substances will be found in the cellular telephone, identified below.

## SEARCH LOCATIONS

14.     I am seeking a search warrant authorizing the search of the following:  one black LG Tracfone Wireless cellular telephone, Identification Numbers:   GPLGL322DCG8 and ZNFL322DL (hereinafter the "**TARGET DEVICE**").

15.     The applied-for warrant would authorize the forensic examination of the **TARGET DEVICE,** which is currently in FBI custody at 425 West Nationwide Boulevard, Columbus, Ohio, for the purpose of identifying electronically stored data particularly described in Attachment A.

## BASIS FOR FACTS/CIRCUMSTANCES CONTAINED IN THIS AFFIDAVIT

16.     The information contained within this Affidavit is derived from my personal knowledge, obtained as a result of my participation in this investigation, as well as from the following sources of information:

a.     Monitored and recorded communications;

b.     Oral and written reports about this and other investigations that I have received, directly or indirectly, from state and local officers, investigators, and detectives, as well as federal agents and task force officers;

c.     Surveillance that has been reported to me, either directly or indirectly;

     d.     Review of telephone toll records and pen register/trap and trace information;

     e.     Independent investigations by local law enforcement organizations; and

     f.     Interviews/conversations with confidential sources.

17. Except where otherwise noted, the information set forth in this Affidavit has been provided to me directly or indirectly by FBI agents and/or task force officers or local law enforcement agents/officers.

18. Unless otherwise noted in this Affidavit, if I assert that a statement was made, the information was provided to me by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed. Such statements are among many statements made by others, and are stated in substance, unless otherwise indicated.

19. Similarly, information resulting from surveillance (except where otherwise indicated) does not set forth my personal observations, but rather observations that have been provided directly or indirectly to me through other law enforcement officers who conducted such surveillance.

20. Whenever I state a belief, that belief is based upon my training and experience, as well as information obtained during this investigation.

21. Further, I do not rely upon facts not set forth herein in reaching my conclusion that a warrant should be issued, nor do I request that this Court rely upon any facts not set forth herein in reviewing this Affidavit in support of the Application authorizing the forensic examination of the **TARGET DEVICE**.

22. Because this Affidavit is being submitted for the limited purpose of seeking authorization for the forensic examination of the **TARGET DEVICE**, I have not set forth each

and every fact learned during the course of this investigation. Instead, I have set forth only those facts that I believe are necessary to establish the requisite probable cause to support a warrant authorizing the forensic examination of the **TARGET DEVICE**.

## FACTS ESTABLISHING PROBABLE CAUSE

23.    This investigation is the result of efforts by the FBI, Ohio State Highway Patrol (OSHP), Ohio Department of Rehabilitation and Corrections (ODRC), and other federal and local law enforcement agencies to investigate the criminal activity, including drug trafficking, of individuals who are members and/or associates of a violent, street and prison gang known as the Hamilton County Bloods, hereinafter the "HCB." [1]

24.    The BLOODS street gang, while a national organization, operates "sets" and/or "subsets" in various cities and counties in the United States. This investigation pertains to the HCB set or subset operating in and around the Southern District of Ohio, including in Hamilton, Butler, Montgomery, Franklin, Ross, and Noble counties, and, more specifically, in and around the Ohio Department of Rehabilitation and Correction (ODRC) prison system to include Ross Correctional Institution (RCI) and Noble Correctional Institution (NCI).

25.    This Affidavit specifically relates to an ongoing investigation into members and/or associates of the HCB, which is a violent street and prison gang, its suppliers, distributors, and higher-level drug-dealers, including Antonio LEICHT (LEICHT), and others known and unknown, and the use of the **TARGET DEVICE**, by LEICHT, to conspire to distribute and to

---

[1]    Unless otherwise noted, throughout this Affidavit, the term "HCB" will be utilized to collectively describe the members, facilitators, and/or sources(s) of supply involved in the ongoing drug trafficking conspiracy in regard to the HCB set and/or subsets operating throughout the ODRC prison system, more specifically the Ross Correctional Institution (RCI) and Noble Correctional Institution (NCI).

possess with intent to distribute controlled substances in the Southern District of Ohio, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

## INFORMATION PROVIDED BY CONFIDENTIAL SOURCE 1 (CS1)

26.     A confidential source (hereinafter CS1) has been cooperating with law enforcement for less than one year. CS1 is currently motivated by consideration for infractions that may occur while in custody and possible beneficial treatment while in custody. [2]

27.     Between June 2021 and the present, CS1 was debriefed on numerous occasions. During these debriefings, CS1 identified Antonio LEICHT (LEICHT) as a known drug courier/trafficker at RCI. CS1 is familiar with LEICHT and has been incarcerated with LEICHT and other HCB members and associates in the same ODRC facilities. CS1 has provided both historical and current information on LEICHT and his co-conspirators. CS1 informed law enforcement that LEICHT is known by the alias "ANT" and was currently incarcerated at RCI.

28.     CS1 indicated that LEICHT smuggles drugs into RCI through the aid of a complicit prison staff member(S) at RCI.     In or around June 2021 CS1 was requested to obtain a "pack" from the laundry room (Quartermaster) at RCI. CS1 advised that a "pack" was a coded prison term for a shipment of drugs. CS1 advised that RCI inmate LEICHT, had been the individual who requested CS1 to obtain the drug shipment. CS1 advised that LEICHT had told CS1 that the drug shipment was concealed under a pile of clothing that was located inside of the room which contains

---

[2]     CS1 has several prior arrests and criminal convictions, including felony convictions. CS1's felony convictions include:  1998 – Felony Receiving Stolen Property; 2001 – Felony Failure to Comply; 2002 – Felony Theft; 2002 – Receiving Stolen Property x2;  2005 – Felony Aggravated Menacing, Felony Theft;  2006 – Felony Passing Bad Checks x2,; 2015 – Felony Possession of Drugs; 2015 – Felony Aggravated Burglary.  Based upon information provided to me from other agents/officers, who had prior conversations with CS1, and based upon the fact that CS1's information was corroborated through other law enforcement means, I believe that the information provided by CS1, relative to the instant investigation, is reliable.

the personnel washer and dryer machines, in the Quartermaster area of RCI. Further, if CS1 obtained the drug shipment on behalf of LEICHT, LEICHT would pay CS1 five (5) suboxone strips. CS1 stated that he/she was unaware of the types or quantities of drugs that were contained inside of this particular drug shipment. CS1 further advised that the majority of the drugs that come into RCI are initially brought into the prison through the R&D (which stands for Receiving and Discharge) and Quartermaster areas at RCI. Additionally, CS1 believes that there is a corrupt Corrections Officer or prison staff member at the prison that was facilitating bringing the drugs into RCI. CS1 stated that this drug shipment was interdicted and seized by corrections officers at RCI.

### INFORMATION PROVIDED BY CONFIDENTIAL SOURCE 2 (CS2)

29.     A confidential source (hereinafter CS2) has been cooperating with law enforcement for less than one year. CS2 is currently motivated by consideration for infractions that may occur while in custody and possible beneficial treatment while in custody.[3]

30.     Between June 2021 and the present, CS2 was debriefed on numerous occasions. During these debriefings, CS2 identified Antonio LEICHT (LEICHT) as a known drug courier/trafficker at RCI. CS2 is familiar with LEICHT and has been incarcerated with LEICHT and other HCB members and associates in the same ODRC facilities. CS2 has provided both historical and current information on LEICHT and his co-conspirators. CS2 informed law enforcement that LEICHT is known by the alias "ANT" and was currently incarcerated at RCI.

---

[3]     CS2 has several prior arrests and criminal convictions, including felony convictions. CS2's felony convictions include: 2011 – Felonious Assault, Improper Handling Discharging of a Weapon in Motor Vehicle x3. Based upon information provided to me from other agents/officers, who had prior conversations with CS2, and based upon the fact that CS2's information was corroborated through other law enforcement means, I believe that the information provided by CS2, relative to the instant investigation, is reliable.

31.     CS2 stated that (CS2) was previously cellmates with Richard EBERHART (EBERHART), also known as "ROWL", at RCI.

32.     CS2 stated that EBERHART was engaged in collecting and distributing drugs that came into RCI through the R&D and Quartermaster areas of the prison through his position as a porter[4] at RCI.

33.     CS2 advised that in or around May 2021 EBERHART was caught with a contraband cellular telephone inside of RCI.   EBERHART attempted to persuade CS2 to take the blame for the cellular telephone and for CS2 to tell prison staff that it was CS2's cellular telephone and not EBERHART's.   CS2 advised EBERHART that he (CS2) would not take responsibility for EBERHART's contraband cellular telephone.

34.     CS2 reported that EBERHART was subsequently sent into segregation for prison infractions.   CS2 stated that the drug supply at RCI was greatly impacted at this time and there were very limited drugs available at the prison.

35.     Around this same time CS2 stated that he received a "scribe"[5] from RCI inmate Garfield HOWARD (HOWARD), also known as "G-FIELDS".

36.     CS2 stated that the scribe instructed CS2 to obtain a shipment of drug saturated paper from RCI inmate and porter LEICHT in the Quartermaster area of RCI.   Once CS2 obtained the drug saturated paper, CS2 was instructed by HOWARD to give the drug saturated paper to any

---

[4]     A porter is a position held by inmates within the ODRC prison system.   In this position, an inmate is responsible for the distribution of supplies or other materials to inmates or staff members at the prison.   The porter position allows the position holder to have regular access to various areas of the prison and staff that other inmates would typically not have access to.

[5]     A scribe is a prison term for a note written on a small piece of paper that is passed from inmate to inmate until it reaches its intended recipient.

inmate coming out of segregation and then to advise HOWARD which inmate he gave it to. CS2 was to communicate this to HOWARD through a scribe.

37.    CS2 stated that HOWARD advised CS2 that CS2 owed HOWARD a drug debt for "tune" [6] and this act would go toward paying off CS2's drug debt.

38.    CS2 stated HOWARD was a member of the BLOODS prison gang at RCI. CS2 stated that the BLOODS controlled the majority of the drug trafficking activities at RCI and often assaulted inmates who interfered with their drug trafficking operations.

39.    CS2 advised that he felt threatened by HOWARD and BLOODS members at RCI and agreed to obtain the drug saturated paper from LEICHT on behalf of HOWARD.

40.    CS2 stated that he was unaware of the type of drugs that the paper was saturated with that he obtained from LEICHT.

41.    CS2 further stated that once he took the folder of drug saturated paper from LEICHT in the Quartermaster area of the prison he was immediately encountered by a Corrections Officer and the drug saturated paper was seized.

42.    CS2 stated that shortly after the drug saturated paper was seized CS2 received an additional scribe from HOWARD stating that CS2's drug debt now included the cost of the approximately 50 sheets of drug saturated paper that CS2 was caught with.

43.    CS2 stated that glass or glasses are coded prison terms for methamphetamine.

44.    CS2 advised that were several inmates at RCI involved in a large-scale drug trafficking operation.

---

[6]    Tune is a prison term for drug saturated paper that is often smoked.

45.     CS2 stated that a former RCI inmate, who goes by the alias "BLO" controls the entire drug trafficking operation at RCI from outside of the prison.  Based on your Affiants training and experience and knowledge of this investigation it is your Affiant's belief that the individual referenced as BLO by CS2 is known to the writer as Diallo BARNES (BARNES).

46.     CS2 advised that BLO controls the access/supply route to smuggle drugs inside of RCI through a corrupt warehouse employee at RCI.  CS2 did not know the corrupt warehouse employees name at RCI but described that corrupt warehouse employee as a black male.  Further, CS2 advised that the drugs were transported into RCI through the R&D and Quartermaster areas of the prison.

47.     CS2 stated that BLO's corrupt warehouse employee packages and conceals the drug shipments into various incoming boxes of products or items coming into RCI prior to their delivery to the prison.

48.     CS2 stated that inmates at RCI pay either approximately $10,000 or $20,000 dollars U.S. currency to utilize BLO's drug trafficking network at RCI in order to transport drugs into the prison facility.  This cost varies with the amount of drugs that the individual inmate wanted transported into the prison.  CS2 stated that BLO would either meet with the inmate's drug supplier outside of the prison to obtain the inmates' drugs on their behalf or BLO would supply inmates with drugs based on their request.  CS2 said that almost any type of drug could be obtained and brought into RCI through BLO and his associates.

49.     CS2 advised that once the drugs arrived into RCI through the Quartermaster and/or R&D areas of the prison they were collected by EBERHART.  EBERHART would then further distribute the drugs to the appropriate inmate at RCI through his position as a porter at the prison.

50.     CS2 stated that HOWARD, was BLO's main associate inside of RCI. CS2 stated that HOWARD was responsible for BLO's drug trafficking operations inside of RCI to include ensuring drug shipments were fulfilled and the drugs were paid for. CS2 further stated that HOWARD also acted as BLO's, "Right hand Man" on behalf of BLO if there were issues or discrepancies with drug transactions HOWARD would address these with inmates at RCI.

51.     CS2 reported that once EBERHART was transferred out of RCI in or around June 2021. After EBERHART's transfer CS2 stated that RCI inmate LEICHT took over EBERHART's position of drug distributor in BARNES and HOWARD's drug trafficking operations inside of RCI.

52.     CS2 stated that he was previously incarcerated with BARNES at RCI.

### **TARGET DEVICE SEIZED DURING SEARCH AT THE PRISON**

53.     On June 15, 2021, ODRC corrections officers were deployed to cell 122 of H2B (Housing Unit 2) at RCI, after receiving an anonymous call to the prison that LEICHT was communicating via Facebook from inside of his prison cell at RCI with unidentified individuals. Corrections officers conducted a pat down search of LEICHT and his cellmate. After securing LEICHT and LEICHT's cellmate inside of the T.V. room, corrections officers conducted a search of cell 122 and discovered a black LG smartphone (**TARGET DEVICE**) on top of a dresser inside of cell 122. Corrections officers questioned LEICHT and LEICHT's cell mate regarding the ownership of **TARGET DEVICE**. Corrections officers stated that LEICHT claimed ownership of **TARGET DEVICE**.

54.     Based on my training and experience, and my knowledge of this investigation, to include the above-described circumstances and the below-described jail call, it is my belief that in

addition, LEICHT utilized **TARGET DEVICE** to facilitate drug trafficking activities with other HCB members and associates inside and outside of RCI and throughout the ODRC prison system.

## JAIL CALLS REGARDING LEICHT's INVOLVEMENT IN DRUG TRAFFICKING ACTIVITIES AT RCI

55.     I have reviewed numerous recorded ODRC GTL telephone communications placed by EBERHART through his ODRC GTL phone system account, A566744. It is my belief that several of these telephone communications recorded over ODRC GTL prison telephone system show that LEICHT is actively engaged drug trafficking with HCB members and associates inside and outside of RCI. The examples identified below are only some of the intercepted communications. The description of the communications reflects my interpretation and explanation of the contents of the communications. I believe that these descriptions are accurate, although they may not be verbatim transcripts.

56.     On June 11, 2021, which is four days prior to the **TARGET DEVICE** being seized as describe above, EBERHART placed an outgoing recorded ODRC GTL prison telephone communication to an Jasmine TURNBOLT (TURNBOLT) who was utilizing (513) 227-4006. I have reviewed this call, and based on my training and experience, and my knowledge of this investigation, the above-referenced conversation can be summarized as follows: TURNBOLT tells EBERHART that she was on the phone with an individual identified as RICKO (Phonetic). EBERHART advises TURNBOLT that he never received his drug shipment of methamphetamine saturated paper because he was in the hole and that HOWARD made EBERHART's cellmate Ricky MANLEY (MANLEY) give HOWARD EBERHART's drug shipment. TURNBOLT tells EBERHART that RICKO wants to know what EBERHART wants him to do. EBERHART instructs TURNBOLT to tell RICKO to get the activation code for a cellphone that EBERHART

15

wants to use and has access to from LEICHT who works in quartermaster. EBERHART then instructs TURNBOLT to tell RICKO to get in contact with an associate that EBERHART refers to as MR. J and tell MR. J that EBERHART needs BARNES. TURNBOLT and EBERHART discuss an individual they reference as LA. TURNBOLT asks EBERHART why EBERHART was dealing with HOWARD. EBERHART tells TURNBOLT that EBERHART and HOWARD have known each other since county jail. EBERHART tells TURNBOLT that HOWARD was at NCI and was recently moved back to RCI. EBERHART and TURNBOLT discuss EBERHART's relationship with HOWARD. EBERHART tells TURNBOLT that EBERHART needs to tell HOWARD and BARNES what to do with EBERHART's methamphetamine saturated paper shipment that EBERHART never obtained. TURNBOLT asks EBERHART what happed to the methamphetamine saturated paper shipment that TURNBOLT supplied to BARNES on EBERHART's behalf. EBERHART tells TURNBOLT that's why EBERHART asked TURNBOLT that's why EBERHART needed to confirm with TURNBOLT the amount of methamphetamine saturated paper that TURNBOLT produced because EBERHART already paid BARNES and HOWARD to have the drugs smuggled into RCI. TURNBOLT advises EBERHART that it was approximately 70 to 75 sheets of methamphetamine saturated paper. EBERHART affirms and tells TURNBOLT that BARNES is going to have to send EBERHART $10,000 U.S. dollars because that is how much EBERHART paid BARNES to have the drugs smuggled into RCI. TURNBOLT affirms. TURNBOLT discusses that she packaged the methamphetamine saturated paper correctly and everything. EBERHART threatens that BARNES is going to get killed or EBERHART will hurt BARNES's associates for interfering with his drug trafficking operation. EBERHART tells TURNBOLT that EBERHART is aware that EBERHART oversees receiving the smuggled drugs into RCI but when EBERHART was in

16

trouble BARNES and HOWARD should have taken care of the drug shipments including EBERHART's drug shipment. EBERHART tells TURNBOLT that BARNES is the main facilitator of the drug shipments into RCI outside of prison. EBERHART tells TURNBOLT that this was the reason EBERHART needs BARNES's number to speak with BARNES. EBERHART tells TURNBOLT that he (EBERHART) will tell BARNES that BARNES is dead if BARNES does not replace EBERHART's drug shipment. EBERHART tells TURNBOLT that BARNES makes his own methamphetamine saturated paper and EBERHART will make BARNES pay for everything EBERHART lost. In addition, EBERHART tells TURNBOLT BARNES will return EBERHART's $10,000 U.S. dollars EBERHART paid to have the drugs smuggled into RCI. EBERHART tells TURNBOLT that BARNES' drug saturated paper is low quality and that is why EBERHART never purchased drugs from BARNES and that is EBERHART only uses BARNES to smuggle the drugs into RCI. EBERHART tells TURNBOLT that HOWARD lost money from the drug trafficking operation at RCI when HOWARD was transferred to NCI because Marcus MINOR (MINOR) aka BAM, Richard GARNETTE (GARNETTE) aka WAKE, aka WACO had poor quality drugs so they could not make money. TURNBOLT asks if GARNETTE was at RCI and EBERHART confirms. EBERHART tells TURNBOLT that BARNES, HOWARD, GARNETTE, MINOR, and their associates are an organization that control the drug trade at RCI. EBERHART tells TURNBOLT that his cell mate (MANLEY) is not from Cincinnati and was from Lima and they threatened MANLEY to give them EBERHART's drugs while EBERHART was in segregation. EBERHART tells TURNBOLT that MANLEY owes EBERHART money as well because MANLEY and EBERHART split a shipment of approximately 100 sheets of drug saturated paper that MANLEY's suppliers made. EBERHART tells TURNBOLT that he ran the distribution at RCI when the shipments came in from BARNES and EBERHART is the only one

who knew how to do it correctly and EBERHART attempted to teach others, but they were scared so it did not work.

57.     On June 11, 2021, which is four days prior to the **TARGET DEVICE** being seized as describe above, EBERHART placed an outgoing recorded ODRC GTL prison telephone communication to an Latasha HAMPTON (HAMPTON) who was utilizing (513) 652-5078. I have reviewed this call, and based on my training and experience, and my knowledge of this investigation, the above-referenced conversation can be summarized as follows: HAMPTON tells EBERHART that the passcode for the cell phone is Monica 2468. HAMPTON then tells EBERHART that she has obtained BARNES cell phone number to call. EBERHART asked how many numbers they gave for BARNES and HAMPTON says just one. HAMPTON tells EBERHART that they asked if EBERHART was on the GTL or a cell phone. EBERHART tells HAMPTON that of course he is on GTL he doesn't have a PIN for the cell phone BARNES and BARNES's associates have the cell phone locked. EBERHART asks HAMPTON what BARNES's number is and HAMPTON states (832) 725-0708. EBERHART tells HAMPTON to ask them what the code is for the phone LEICHT gave EBERHART. HAMPTON again confirms that the (832) 725-0708 is the number EBERHART is supposed to call BARNES at.

58.     On June 11, 2021, which is four days prior to the **TARGET DEVICE** being seized as describe above, EBERHART placed an outgoing recorded ODRC GTL prison telephone communication to an Latasha HAMPTON (HAMPTON) who was utilizing (513) 652-5078. HAMPTON then proceeds to place a three way call to BARNES on behalf of EBERHART. I have reviewed this call, and based on my training and experience, and my knowledge of this investigation, the above-referenced conversation can be summarized as follows: BARNES advises EBERHART that he (BARNES) is aware that EBERHART was caught with a cell phone and it

was seized while at RCI. BARNES is concerned that EBERHART admitted to it and was cooperating with investigators. EBERHART assures BARNES that it's all made up and he didn't admit to anything. EBERHART advises BARNES that he (EBERHART) did not know the gang coordinator and that the investigators at RCI could not prevent EBERHART's transfer to Belmont Correctional Institution (BCI). EBERHART tells BARNES that EBERHART has drugs still at RCI that are waiting to be sent to him with his property sitting in R&D. EBERHART tells BARNES that the price of drugs is exceptionally higher at BCI than RCI and there is profit to be made. BANRES tells EBERHART that the drugs BARNES is going to be able to supply to EBERHART and another associate are poor quality. EBERHART tells BARNES that the drug quality does not matter and EBERHART will be able to move the drugs at BCI because there is no current supply. BARNES wants to know how EBERHART will communicate with him. EBERHART tells BARNES that he has a cell phone but doesn't have the activation code. EBERHART tells BARNES that LEICHT and other associates of EBERHART and BARNES are not smart. BARNES and EBERHART discuss heroin trafficking activity and an associate identified as MR. J. BARNES tells EBERHART that EBERHART and MR. J were not even supposed to get a heroin shipment and that was another customer's drug shipment. EBERHART tells BARNES that MR. J owed EBERHART approximately $1,000 U.S. dollars so he obtained the drugs from MR. J to sell. EBERHART tells BARNES that EBERHART was trying to get messages to people to ask BARNES what drug order EBERHART was supposed to get from MR. J from a drug shipment. BARNES tells EBERHART that he (BARNES) will speak with MR. J and make sure EBERHART is supplied with the drugs. HAMPTON interjects into the conversation and says that she believes EBERHART's cell mate stole the drugs that were intended for EBERHART and supplied by BARNES. BARNES affirms that he had heard the same.

19

BARNES and EBERHART discuss previous drug and money transactions that occurred between them and were facilitated with Jaimee COLVIN (COLVIN) aka Jaimee FIELDS. EBERHART tells BARNES that EBERHART gave Ricky MANLEY (MANLEY) aka Rick, approximately $2,500 U.S. dollars for drugs and EBERHART didn't get any drugs so MANLEY owes EBERHART the money back. BARNES tells EBERHART that they owe BARNES money and it's not going away. EBERHART and BARNES discuss a previous instance BARNES supplied EBERHART with drugs and EBERHART gave approximately 10 sheets of drug saturated paper to MANLEY for approximately $500 per sheet. BARNES tells EBERHART that he didn't receive and money from that transaction. BARNES tells EBERHART that MANLEY is about to get transferred out of RCI. EBERHART tells BARNES that EBERHART believes MANLEY cooperated with investigators. BARNES agrees. EBERHART tells BARNES that LEICHT told EBERHART that there are only 21 sheets of the methamphetamine saturated paper left. EBERHART tells BARNES that EBERHART told LEICHT that there was significantly more methamphetamine saturated paper than 21 sheets. BARNES tells EBERHART that's because investigators seized the rest of the methamphetamine saturated paper. EBERHART tells BARNES that he understands and as soon as COLVIN gets off work, he will have her send BARNES a money payment through an app for the drug debt. BARNES asks when COLVIN is going to start paying and EBERHART tells BARNES today. EBERHART tells BARNES that he EBERHART didn't have BARNES' number and that is why EBERHART tried to contact BARNES through the JPAY prison email system. EBERHART tells BARNES to call COLVIN at the 266 number. EBERHART again tells BARNES that MANLEY was acting strange. EBERHART tells BARNES that he sent drugs to an associate known as COOL WALK, but it was the wrong drugs. BARNES tells EBERHART that's why he is looking into everything now. BARNES tells

20

EBERHART that they will try to get the drugs that are in EBERHART's property that is going to be sent to EBERHART at BCI, but people are cooperating with investigators. EBERHART affirms. EBERHART asks if an associate referenced as LIGHT SKIN paid his drug debt to BARNES, BARNES says that he did not, and it is making them look bad. BARNES asks EBERHART how EBERHART is going to communicate with BARNES and EBERHART tells BARNES that EBERHART will get the code for the cell phone and contact BARNES. BARNES affirms. EBERHART tells BARNES that one sheet of drug saturated paper will go for $1,000 U.S. dollars at BCI. BARNES tells EBERHART that he will supply EBERHART with drugs and not to get upset. EBERHART tells BARNES that he is going to send BARNES approximately $16,000 U.S. dollars to go towards his drug debt with BARNES. EBERHART tells BARNES that he can only send the money in certain increments because he has been locked out of his account. BARNES tells EBERHART that BARNES will speak with COLVIN and asks if EBERHART will have COLVIN call BARNES today. EBERHART affirms.

## TERMS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. Based on my training and experience, I use the technical term "wireless telephone" to convey the following meaning: a wireless telephone (or mobile telephone, smartphone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone

number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

60. Nature of examination: Based on the foregoing, and consistent with Fed. R. Crim. P. 41(e)(2)(B), the warrant I am applying for would permit the examination of the **TARGET DEVICE** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection, in order to determine whether it is evidence described by the warrant.

61. Manner of execution: Because this warrant seeks only permission to examine a **TARGET DEVICE** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

62. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until thirty (30) days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or

user of the **TARGET DEVICE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment A, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

## **CONCLUSION**

63.     I submit that this Affidavit establishes probable cause justifying a search warrant authorizing the examination of the **TARGET DEVICE** described in Attachment A, Section I, for the items described in Attachment A, Section II.

The above information is true and correct to the best of my knowledge, information, and belief.

JOHN YPSILANTIS
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 41(b)(2)(A),
this  21st  day of October 2021.

Kimberly A. Jolson
United States Magistrate Judge

## ATTACHMENT A

### I.     Property to Be Searched

One black LG Tracfone Wireless cellular telephone, Identification Numbers: GPLGL322DCG8 and ZNFL322DL, (hereinafter the "**TARGET DEVICE**"), which is currently in FBI custody at 425 West Nationwide Boulevard, Columbus, Ohio, for the purpose of identifying electronically stored data particularly described in Attachment A, Section II.

### II.     Information to Be Seized

All records, information, and items evidencing who used the **TARGET DEVICE**, identified above and/or when and/or from where, as well as evidence, instrumentalities, or fruits of violations 21 U.S.C. § 841(a)(1), distribution and possession with intent to distribute controlled substances, and 21 U.S.C. § 846, conspiracy to distribute and possess with the intent to distribute controlled substances, including:

     a.     incoming and outgoing call and text message logs;

     b.     contact lists;

     c.     photo and video galleries;

     d.     sent and received text messages;

     e.     online searches and sites viewed via the internet;

     f.     online or electronic communications sent and received, including email, chat, and instant messages;

     g.     sent and received audio files;

     h.     navigation, mapping, and GPS files;

     i.     telephone settings, including speed dial numbers and the telephone number for the **TARGET DEVICE** and related identifying information such as the ESN for the **TARGET DEVICE**;

     j.     call forwarding information;

k.      messages drafted but not sent; and

l.      voice messages.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  No real-time communications will be intercepted or searched.

In searching the **TARGET DEVICE**, federal agents may examine all of the data contained in the **TARGET DEVICE** to view its precise contents and determine whether the **TARGET DEVICE** and/or data falls within the information to be seized as set forth above.  In addition, they may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.